**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 19-145-DLB-CJS**

**NOVOLEX HOLDINGS, LLC, et al.**                                    **PLAINTIFFS**


**v.**                        **MEMORANDUM OPINION AND ORDER**


**JOHN WURZBURGER**                                                **DEFENDANT**

**\*\*\* \*\*\* \*\*\* \*\*\***

This matter is before the Court on Defendant John Wurzburger's Partial Motion to
Dismiss (Doc. # 12).  Specifically, pursuant to Federal Rule of Civil Procedure 12(b)(6)
he asks that all claims asserted by Plaintiffs Waddington Group, Inc. and WNA, Inc. be
dismissed, as well as seven of the claims asserted by Plaintiff Novolex Holdings, LLC.
*Id.* at 1.  The Motion having been fully briefed, (Docs. # 17 and # 18), it is now ripe for the
Court's review.  For the reasons set forth herein, the Motion to Dismiss is **granted in part**
and **denied in part**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This matter arises from the sale of Plaintiff The Waddington Group ("TWG") from
Newell Brands, Inc. ("Newell") to Plaintiff Novolex Holdings, LLC ("Novolex") in June of
2018.[1]  (Doc. # 1 at 1).  Defendant John Wurzburger was the CEO of TWG from 2015

---

[1]      WNA, Inc. ("WNA") is the final Plaintiff in this action.  WNA is not mentioned in the
Complaint, however, beyond noting its citizenship.  (Doc. # 1 at ¶ 3).  It is unclear from the
Complaint how WNA is related to, or was impacted by, the allegations in the Complaint.  Plaintiffs
suggest in their response to the Motion to Dismiss that WNA employed Wurzburger in some
capacity.  (Doc. # 17 at 18) ("As President of TWG, an employee of WNA, and an agent of
Novolex, Wurzburger owed each of the Plaintiffs fiduciary duties of care and loyalty.").

until its acquisition by Novolex; after TWG was acquired, "Wurzburger continued to oversee TWG's operation under Novolex's ownership until he was terminated in December of 2018." *Id.*

On May 2, 2018, Novolex signed a contract (the "Agreement") agreeing to purchase TWG from Newell for 2.275 billion dollars, a price based on TWG's projected "earnings before interest, taxes, depreciation, and amortization." *Id.* at ¶¶ 8–10. The deal closed on June 29, 2018. *Id.* at ¶ 11. In preparation for the sale (the "Transaction"), Novolex undertook due diligence of TWG. *Id.* at ¶¶ 17–19. Wurzburger had been identified by Newell as "the primary person who could answer questions for Novolex regarding TWG." *Id.* at ¶ 17. In fact, Wurzburger allegedly gave presentations to Novolex about TWG and answered questions about TWG; he was also listed in the Agreement "as a person with 'Knowledge' for [Newell]." *Id.* at ¶¶ 17–18.

Novolex now alleges that Wurzburger was not honest in providing information during the due diligence process. Specifically, Novolex accuses Wurzburger of failing to inform Novolex that TWG's third largest customer ("Material Customer"), starting in late 2017, began "express[ing] frustration with TWG about pricing and the quality of TWG's performance under its contracts." *Id.* at ¶ 22. Allegedly, these complaints were ongoing through the closing of the Transaction. *Id.* at ¶ 24. Novolex specifically alleges that prior to the signing of the Agreement in May 2018, the Material Customer had told TWG "that it was going to make . . . a 'hard switch' away from one of TWG's contracts to find alternative suppliers." *Id.* at ¶ 25. Then, between the signing of the Agreement and closing, the Material Customer "informed TWG that, for the first time in years, it would end a set of promotional contracts that generated large orders by the Material Customer

for TWG's products." *Id.* at ¶ 26.  On June 22, 2018, the Material Customer told TWG "that it had selected competing offers and the promotions contracts were closed." *Id.* Novolex alleges that, despite Wurzburger knowing that the loss of the Material Customer's contracts was problematic for the Transaction, he did not inform Novolex of the issue until 10 days after the closing of the Transaction. *Id.* at ¶¶ 27–30, 32.  In sum, Novolex accuses Wurzburger of failing to disclose that TWG's financial projections, which were provided to Novolex, were not attainable. *Id.* at ¶¶ 20–21.

It is further alleged that Wurzburger continued to provide incorrect information about "customer relations, operations, and finances" after the Transaction's closing. *Id.* at ¶¶ 33–34.  Specifically, Novolex alleges that Wurzburger "withheld information . . . regarding the status of the TWG Recovery Plan[2] and the chances for its success" and "responded to management with inconsistent or incorrect data," among other things. *Id.* at ¶¶ 35–36.  It claims that Wurzburger also encouraged others at TWG to withhold information. *Id.* at ¶ 37.  Allegedly, these actions "undermined Novolex's efforts to address TWG's numerous negative business issues and put Novolex at risk of having a culture in which withholding information, or providing false information, was actively encouraged." *Id.* at ¶ 38.  As a result of his actions, Wurzburger was not able to adequately do his job and he was terminated on December 14, 2018. *Id.* at ¶¶ 41–42. Additionally, Wurzburger allegedly took Novolex's confidential information, shared it with his attorneys, and refused to return it, despite being obligated to do so. *Id.* at ¶¶ 46–48.

---

[2]     The Complaint does not explain what the TWG Recovery Plan entails.  It merely states the following: "[b]ecause the TWG business that was acquired by Novolex was very different from what had been represented to Novolex, Novolex was required to implement a recovery plan for TWG (the "TWG Recovery Plan")."  (Doc. # 1 at ¶ 35).

Novolex alleges that Wurzburger had incentives to hide information to ensure the Transaction closed and that he remained employed at TWG. *Id.* at ¶¶ 13–16. Specifically, after the closing he "received nearly one million dollars in the form of a cash payment, a management bonus, and an equity payment." *Id.* at ¶ 16. Additionally, if he stayed employed at TWG until the end of 2018 and met other requirements, he was to receive a multi-million-dollar payout under a Special Incentive Plan ("SIP"). *Id.* at ¶¶ 14–15.

As a result of Wurzburger's actions, Novolex alleges that it "closed the Transaction at an unjustified price, resulting in a loss of approximately $267 million (i.e. the difference between what Novolex paid for TWG and TWG's actual value based on the facts concealed from Novolex prior to the Closing)." *Id.* at 3. It further claims that additional damages "continue to mount." *Id.* Accordingly, Novolex, along with TWG and WNA, bring the instant suit[3] alleging that "Wurzburger's deceitful actions violated contractual and common law duties that he owed Novolex and significantly damaged Novolex as a consequence." *Id.* Specifically, Plaintiffs bring claims of negligent misrepresentation (Count I), fraudulent misrepresentation (Count II) and interference with a contract (Count III) for his pre-closing actions. *Id.* at ¶¶ 49–69. They also bring claims of breach of contract (Count IV),[4] declaratory judgment (Count V), conversion (Count VI), breach of fiduciary duty (Count VII), negligent misrepresentation (Count VIII), and fraudulent misrepresentation (Count IX) for Wurzburger's post-closing actions. *Id.* at ¶¶ 70–115. Novolex asks that, *inter alia*, Wurzburger return the compensation he received after the

---

[3]    In the Complaint, all three Plaintiffs are collectively referred to as "Novolex." *Id.* at 1.

[4]    This count appears to have been mistakenly labeled as "Count VI" in the Complaint. *Id.* at 13.

closing and under the SIP and that Novolex be paid compensatory, consequential, and punitive damages.  *Id.* at 20.

In response to the Complaint, Wurzburger moved to dismiss all of the claims brought by TWG and WNA, as well as the negligent and fraudulent-misrepresentation claims, the interference-with-a-contract claim, the conversion claim, and the breach-of-fiduciary-duty claim.  (Doc. # 12).  That Partial Motion to Dismiss is ripe, (Docs. # 17 and # 18), and is now before the Court.

## II.   ANALYSIS

### A.   Standard of Review

Upon a Rule 12(b)(6) motion to dismiss, a court may dismiss a complaint that "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  A complaint does not have to show that liability is probable, "but asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).

When evaluating a complaint, a court must accept all facts pled in the complaint as true.  *Id.*  It need not, however, "accept as true a legal conclusion couched as a factual allegation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Merely stating the elements of a

claim is insufficient; while "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 678–79.

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court "may consider the [c]omplaint, and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).  Considering documents beyond these converts a motion to dismiss into a motion for summary judgment.  *Spencer v. Grand River Nav. Co., Inc.*, 644 F. App'x 559, 561–62 (6th Cir. 2016) (citing *Bassett*, 528 F.3d at 430).  Additionally, however, "supplemental documents attached to a 12(b)(6) . . . motion" may "convert the motion into one for summary judgment where the documents ... 'rebut, challenge, or contradict anything in the plaintiff['s] complaint.'"  *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 764 (E.D. Ky. 2019) (quoting *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993)).

Here, attached to the Motion to Dismiss is the complaint in a related case filed in Delaware state court.  (Doc. # 12-1 at 2–66).  Attached to that complaint are a number of exhibits, *id.* at 68–211, including the Agreement (labeled as the Equity Purchase Agreement) between Novolex and Newell which governed the purchase of TWG by Novolex, *id.* at 69–171.  Also attached to the Motion is the Return of Property Agreement, (Doc. # 12-2), which "provides for 'the return of Novolex property in Wurzburger's possession and the deletion of Novolex's property from data sources in Wurzburger's possession and control.'"  (Doc. # 12 at 4) (quoting (Doc. # 12-2 at 2)).  The Delaware

complaint, many of its exhibits, and the Return of Property Agreement are not discussed in the Complaint, *see* (Doc. # 1), but the Agreement is and is central to the claims which ultimately arose out of the Transaction, *see, e.g.*, *id.* at ¶ 8.  Additionally, the Agreement does not appear to "rebut, challenge, or contradict anything in the plaintiff['s] complaint." *Arnold*, 392 F. Supp. 3d at 764 (quoting *Song*, 985 F.2d at 842).  Accordingly, the Court may consider the Agreement, but not the Delaware complaint, its other exhibits, or the Return of Property Agreement when adjudicating this Motion without converting it to a summary-judgment motion.

      **B.**    **Choice of Law**

      Before considering any of the other arguments put forth by the parties, the Court must first determine the threshold issue of which law applies to the case at bar.  *See Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014); *Se. Tex. Inns, Inc. v. Prime Hospitality Corp.* 462 F.3d 666, 672 (6th Cir. 2006).  This suit is in federal court on the basis of diversity jurisdiction.  *See* (Doc. # 1 at ¶ 5); *see also* 28 U.S.C. § 1332(a).  Federal courts in diversity cases apply the substantive law of the state in which the court sits, *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (discussing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)); this includes that state's choice-of-law rules, *Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820 (6th Cir. 1990)).

      Under Kentucky choice-of-law rules "there is a strong preference . . . for applying Kentucky law."  *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707 (W.D. Ky. Sept. 6, 2013) (collecting cases).  In general, "a court must apply Kentucky's law when

there are not overwhelming interests to the contrary." *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 666 (E.D. Ky. 2010); *see also Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983) ("Kentucky courts have apparently applied Kentucky substantive law whenever possible . . . if there are sufficient contacts and no overwhelming interests to the contrary."); *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972) ("When the court has jurisdiction of the parties its primary responsibility is to follow its own substantive law. The basic law is the law of the forum, which should not be displaced without valid reasons.").   In other words, Kentucky is "very egocentric or protective concerning choice of law questions." *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App. 1987), *overruled on other grounds by Oliver v. Schultz*, 885 S.W.2d 699 (Ky. 1994).   "The Sixth Circuit has routinely recognized this 'provincial tendency' when applying Kentucky's choice of law rules." *Dukes v. Mid-Eastern Athletic Conference*, No. 3:16-cv-303-RGJ-RSE, 2018 WL 6112415, at *2 (W.D. Ky. Nov. 21, 2018) (collecting cases).

In Kentucky, separate choice-of-law analyses exist for claims arising under tort and contract law.  *Wells Fargo Fin. Leasing, Inc.*, 970 F. Supp. 2d at 707 (citing *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009)).   For tort claims, Kentucky law will apply if there are any "significant contacts—not necessarily the most significant—with Kentucky."[5]

---

[5]      There is some suggestion "that Kentucky may have abandoned the 'any significant contact' test in tort cases for the 'most significant contact' test."  *Cutter v. Ethicon, Inc.*, 5:19-cv-443-DCR, 2020 WL 109809, at *4 n.4 (E.D. Ky. Jan. 9, 2020) (citing *Kirilenko v. Kirilenko*, 505 S.W.3d 766, 769 (Ky. 2016)).  It is "unclear, however, because *Kirilenko* was a divorce case that did not involve a tort claim" and "supports [the apparent principle that the most significant contact test is applied to tort claims] by citing to a *Saleba* footnote that explicitly endorses the 'any significant contact' test for choice of law determinations regarding tort claims."  *Id.* (citing *Saleba*, 200 S.W.3d at 182 n.2).

*Foster*, 484 S.W.2d at 829; *see also Saleba*, 300 S.W.3d at 181; *Brewster v. Colgate-Palmolive Co.*, 279 S.W.3d 142, 145 n.8 (Ky. 2009).  On the other hand, Kentucky law applies in contract cases when Kentucky meets "the 'most significant contacts' test, set forth in § 188 of the Restatement (Second) of Conflict Laws."[6]  *Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971, 981 (E.D. Ky. 2016) (citing *Saleba*, 300 S.W.3d at 181). When a contract includes a choice-of-law provision which governs its interpretation, the same test applies and "trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky." *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 574–75 (6th Cir. 2019) (quoting *Osborn v. Griffin*, 865 F.3d 417, 444 (6th Cir. 2017)); *see also Wells Fargo Fin. Leasing, Inc.*, 970 F. Supp. 2d at 707–10).

In this case, there are claims sounding in both tort and contract.  The resolution of the applicable law for the contract claims is simple.   The contract at issue is the Agreement governing the sale of TWG from Newell to Novolex.  (Doc. # 12-1 at 69–171). The Agreement has a clear choice-of-law provision which indicates that any interpretation of the Agreement shall be governed by Delaware law.  *Id.* at 166–67.  Additionally, there is no suggestion that the dispute "is centered predominantly in Kentucky" or that Kentucky has the most significant relationship to the dispute.  *Boling*, 771 F. App'x at 574–76.  In fact, Delaware has at least some significant contacts with the Agreement as both parties

---

[6]     This section of the Restatement directs a Court to consider the following factors to determine which law applies to a contract: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (AM. LAW INST. 1971).  The Restatement notes that the "contacts are to be evaluated according to the relative importance with respect to the particular issue" and often when a contract is negotiated and performed in the same state, that state's law will apply unless an exception in §§ 189–199, 203 of the Restatement apply.  *Id.*

to the Agreement are citizens of Delaware.  (Doc. 12-1 at 75) (indicating that Newell is a Delaware corporation and Novolex is a Delaware limited liability company).  Thus, it appears that the choice-of-law provision in the Agreement should be enforced.  Moreover, both parties agree that this is the case, so the court need not belabor the choice-of-law analysis as to the contract claims.  *See Kirsch v. Dean*, No. 3:16-cv-00299-CRS, 2016 WL 4536444, at *2 (W.D. Ky. Aug. 30, 2016) (collecting cases) ("When parties agree about the choice of law to be applied, however, the court need not address choice of law questions.").

The disputed choice-of-law issue arises as to Plaintiffs' tort claims.  *See* (Docs. # 12 at 9 and # 18 at 5–6) (Defendant arguing that North Carolina law should apply because he resides in North Carolina and undertook his work from North Carolina); (Doc. # 17 at 4–6) (Plaintiffs arguing that Delaware law should apply for consistency's sake or, in the alternative, Kentucky law should apply because two Plaintiffs have their principal place of business in Kentucky).  When determining the applicable law for tort claims, "any significant contact with Kentucky [is] sufficient to allow Kentucky law to be applied." *Chatterjee v. CBS Corp.*, No. 6:19-cv-212-REW, 2020 WL 592324, at *5 n.6 (E.D. Ky. Feb. 6, 2020) (quoting *Bonnlander v. Leader Nat'l Ins. Co.*, 949 S.W.2d 618, 620 (Ky. Ct. App. 1996)).  The Court is not to weigh different states' interests in the case, but rather must make the determination "simply on the basis of whether Kentucky has enough contacts to justify applying Kentucky law."  *Arnett v. Thompson*, 433 S.W.2d 109, 113 (Ky. Ct. App. 1968).

As this court has previously recognized, the residence of a *plaintiff* in Kentucky is considered such a significant contact that it justifies the application of Kentucky law.

*Warndorf v. Otis Elevator Co.*, No. 2:17-cv-159-DLB-CJS, 2019 WL 137585, at *2 (E.D. Ky. Jan. 8, 2019)[7]; *Aces High Coal Sales, Inc. v. Cmty. Tr. & Bank of W. Ga.*, No. 2:15-cv-161-DLB-HAI, 2017 WL 3122661, at *12 (E.D. Ky. July 21, 2017).  This rule arises from the fact "that 'Kentucky's tort . . . laws are intended to protect Kentucky residents and provide compensation when they are *the injured party*.'"  *Hoagland v. Ford Motor Co.*, No. Civ.A. 06-615-C, 2007 WL 2789768, at *4 (W.D. Ky. Sept. 21, 2007) (quoting *Custom Prods. Inc. v. Fluor Daniel Can., Inc.*, 262 F. Supp. 2d 767, 773 (W.D. Ky. 2003)).  Thus, it is appropriate for Kentucky law to apply to the tort claims here in light of the fact that two of the Plaintiffs in this case are citizens of Kentucky, *see Warndorf*, 2019 WL 1377585, at *2; *Aces High Coal Sales, Inc.*, 2017 WL 3122661, at *12; *see also MW Universal, Inc. v. G5 Capital Partners, LLC*, No. 08-cv-495-KSF, 2012 WL 588743, at *4 (E.D. Ky. Feb. 21, 2012) (applying Kentucky law to tort claims when the defendant's "conduct and representations in this matter, as well as the damages suffered by [the plaintiff], were directed to [the plaintiff] at its principal place of business in Paris, Kentucky"), and that the Court must begin from the default position that Kentucky law will govern the tort claims unless there are "overwhelming interests to the contrary," *Asher*, 737 F. Supp. 2d at 666; *see also Harris Corp.*, 712 F.2d at 1071.  There are no such overwhelming interests to the contrary here.  Accordingly, the Court will apply Delaware law to interpret the Agreement and Kentucky law to the tort claims.

---

[7]     Defendant's citation of *Warndorf* is misguided.  *Warndorf*'s choice-of-law analysis does not stand for the proposition that a Kentucky court will apply the law of the state in which *any* individual party resides, as Wurzburger seems to suggest.  *See* (Doc. # 12 at 9).  Rather, it stands for the more limited principle that Kentucky courts will apply Kentucky law to tort claims when the *plaintiff* is a Kentucky resident, as Kentucky laws are intended to protect Kentucky tort victims.  *See Warndorf*, 2019 WL 137585, at *2.

C.    **Claims brought by TWG and WNA**

At the outset of his Motion, Wurzburger asks the Court to dismiss all of the claims brought by TWG and WNA as there are no allegations that these particular entities were harmed by the alleged actions of Wurzburger.  (Doc. # 12 at 5–7).  Defendant suggests that these entities are separate from Novolex and have "independent claims that must be analyzed separately."  (Doc. # 18 at 2).  He makes these allegations in light of the fact that the Complaint groups all three Plaintiffs together as "Novolex" while also referring to them as distinct entities.  (Doc. # 12 at 5–6); *see also* (Doc. # 1 at 1).  The Plaintiffs, on the other hand, claim that both TWG and WNA have viable claims against Wurzburger. (Doc. # 17 at 6–9).

Under Federal Rule of Civil Procedure 8(a) a plaintiff must plead "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While plaintiffs are permitted "to jointly make factual allegations against the Defendant[] in a single complaint . . . it does not relieve Plaintiffs of their obligation to provide Defendants with enough information to defend against the claims of each individual Plaintiff."  *Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341, 1344 (W.D. Mich. 2011).  In other words, "each individual Plaintiff *is* obligated to state how Defendant[']s alleged behavior give [it] in particular a right to relief."  *Id*.; *see also Aaron v. Durrani*, No. 1:13-cv-202, 2013 WL 5177144, at *3 (S.D. Ohio. Sept. 12, 2013) ("It is well-settled law that named plaintiffs may not rely on general class allegations to support their claims, but rather must show that each, individually, is entitled to relief." (citing *Warth v. Seldin*, 422

U.S. 490, 502 (1975); *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 659 (3rd Cir. 1998))).

Upon reviewing the Complaint, it is clear that the Plaintiffs have not met their burden.   As Wurzburger noted, the Complaint jointly refers to all three Plaintiffs as "Novolex," (Doc. # 1 at 1), which is permissible, *Abnet*, 786 F. Supp. 2d at 1344.   The Complaint does not, however, specifically identify how each Plaintiff was harmed by Defendant's alleged actions.  *See* (Doc. # 1).  In fact, at no point does the Complaint even identify how WNA is related to the situation described in the lawsuit.  *See id.* at ¶ 3 (explaining the citizenship of WNA; the only mention of WNA outside of the caption and introductory paragraph).  Moreover, the Complaint only appears to discuss TWG because it is the entity that was purchased by Novolex and *about which* Wurzburger's alleged statements were made.  *See, e.g.*, *id.* at 2, ¶¶ 17–21.  There is no suggestion that TWG *itself* was harmed by Wurzburger's alleged actions.  *See generally id.*   In sum, none of the facts put forth in the Complaint provide any allegations that would plausibly suggest that either TWG or WNA were impacted in any way by Wurzburger's alleged actions. Rather, the Complaint merely sets forth facts suggesting that *Novolex* was harmed by these alleged actions.   As the allegations set forth in the Complaint are insufficient to provide the Defendant with the information needed for him "to defend against the claims of *each individual Plaintiff*," *Abnet*, 786 F. Supp. 2d at 1344 (emphasis added), the Motion to Dismiss as to claims asserted by TWG and WNA must be **granted** and the claims asserted by those Plaintiffs **dismissed**.

### D.    Pre-Closing Claims

Also at the outset, Wurzburger argues that certain language in the Agreement shields him from any liability for his alleged actions—including misrepresentations and omissions—he took prior to the closing.  (Doc. # 12 at 7–9).  Specifically, he cites the portion of the Agreement which defines Knowledge in the following way: "'Knowledge' means, with respect to [Newell], the knowledge, after due inquiry and investigation, of John Wurzburger, Ryan Stephens, Ian Jacobson and Rich Mills, none of whom will have any personal liability or obligations regarding such knowledge."  *Id.*; *see also* (Doc. # 12-1 at 151).  Wurzburger argues that, "[t]his provision clearly states that Wurzburger was speaking on behalf of Newell when making statements to Novolex and cannot be held personally liable or otherwise personally obligated with respect to his knowledge."  (Doc. # 12 at 8).  The Plaintiffs argue that the limitation only absolves Wurzburger of contractual liability and a broader reading is not supported by public policy, (Doc. # 17 at 9–12); this understanding, however, is misguided.

Under Delaware law, "[i]f a contract's terms are clear and unambiguous, the court will interpret such terms according to their ordinary and usual meaning."  *Cont'l Warranty, Inc. v. Warner*, 108 F. Supp. 3d 256, 259 (D. Del. 2015) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)).  "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."  *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.3d 1192, 1195 (Del. 1992)).  "Rather, an ambiguity exists '[w]hen the provisions in the controversy are fairly susceptible of different interpretations or may have two or more different meanings.'"  *Id.*

14

(alteration in original) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

The Agreement includes a list of representations Newell made about TWG including representations regarding potential litigation, material contracts, environmental issues and hazardous substances, etc. *See generally* (Doc. # 12-1 at 82–97) (Article III of the Transaction Agreement which covers "Representations and Warranties of Parent"). One such representation is of particular importance here:

> Section 3.18 <u>Significant Customers and Suppliers</u>. <u>Section 3.18</u> of the Seller Disclosure Letter sets forth a true and correct list of each of the ten largest customers and ten largest suppliers of the Purchased Companies, taken as a whole (such customers and suppliers, the "<u>Material Relationships</u>"), as determined, in the case of customers, by payments by each such customer and, in the case of suppliers, by value of sales by each such supplier, during the twelve months ended February 28, 2018. *Since December 31, 2017, there has not been any written notice or, to the Knowledge of [Newell], any oral notice, from any such Material Relationship that such Material Relationship has terminated, canceled or adversely and materially modified or intends to terminate, cancel or adversely and materially modify any Contract between a Purchased Company and such Material Relationship.*

*Id.* at 95–96 (emphasis added). A plain reading of this provision, in conjunction with the definition of "Knowledge" provided in the Agreement, makes clear that Wurzburger and the others mentioned are shielded from any liability regarding their knowledge of a Material Relationship, including the Material Customer, intending to cancel or "adversely and materially modify" a contract with TWG. *Id.* at 95–96, 151. A plain reading[8] of the "Knowledge" definition does not indicate that the liability shield is limited to contractual

---

[8]      Given the absolute and clear language in the "Knowledge" definition, the Court does not find that the definition is *reasonably* susceptible to different interpretations. Accordingly, it must be interpreted according to its ordinary meaning. *See Continental Warranty, Inc.*, 108 F. Supp. 3d at 259–60 (citations omitted); *GMG Capital Invs., LLC*, 36 A.3d at 780 (citations omitted).

liability as Plaintiffs suggest; rather, the definition is quite clear that liability for *any* claim is covered.  *Id.*  Moreover, as Wurzburger is not a signatory to the Agreement and, therefore, not subject to a breach-of-contract claim under the Agreement, *cf. Daughterty v. Am. Exp. Co.*, 485 F. App'x 746, 747–48 (6th Cir. 2012), a provision limiting only contractual liability under the Agreement provides him with no protection.  In order for the "Knowledge" definition, and particularly the liability shield, to make sense, it must be understood to cover all liability.[9]  Accordingly, the Court finds that Wurzburger is shielded

---

[9]     The Plaintiffs' argument that this reading would violate Kentucky public policy is misguided.  Plaintiffs are correct that "Kentucky's general choice-of-law rule is only disregarded when Kentucky's public policy clearly overwhelmingly disfavors application of the foreign state's law."  *LaCrosse v. Owners Ins. Co.*, 531 S.W.3d 25, 30 (Ky. Ct. App. 2016) (citing *State Farm Mut. Auto Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 879–80 (Ky. 2013)); *see also* (Doc. # 17 at 11).  However, "[c]ourts will not disregard the plain terms of a contract between private parties on public policy grounds absent a *clear and certain statement of strong public policy* in controlling laws or judicial precedent."  *Hodgkiss-Warrick*, 413 S.W.3d at 880–81 (emphasis added).  In Kentucky, "public policy, invoked to bar the enforcement of a contract, is not simply something courts establish from general considerations of supposed public interest, but rather something that must be found *clearly expressed in the applicable law*."  *Id.* (emphasis added) (citing *Ky. Farm Bureau Mut. Ins. Co. v. Thompson*, 1 S.W.3d 475, 476–77 (Ky. 1999)).  In considering whether a contract violates public policy and whether Kentucky public policy should override the 'most significant relationship' test[,] [t]he critical question is 'whether the public policy [is] so strong as to require a Kentucky court to interject Kentucky law into a dispute having none but a fortuitous connection with Kentucky.'"  *Henry v. Travelers Personal Security Ins. Co.*, No. 2016-CA-001939-MR, 2018 WL 678282, at *3 (Ky. Ct. App. Feb. 2, 2018) (last alteration in original) (quoting *Hodgkiss-Warrick*, 413 S.W.3d at 882).

Plaintiffs have failed to show "a clear and certain statement of strong public policy in controlling laws or judicial precedent" which would indicate that the at-issue provision violates Kentucky public policy.  *See Hodgkiss-Warrick*, 413 S.W.3d at 880–81.  Plaintiffs have pointed to a case that is nearly 65 years old in support of their proposition that the contract provision is against Kentucky public policy.  (Doc. # 17 at 11) (quoting *Bryant v. Troutman*, 287 S.W.2d 918, 921 (Ky. Ct. App. 1956)).  *Bryant* quotes from a 1927 Minnesota Supreme Court case which seems to indicate that a provision providing immunity from fraud is against public policy, *presumably in Minnesota.*  *Bryant*, 287 S.W.2d at 921 (quoting *Ganley Bros. v. Butler Bros. Building Co.*, 212 N.W. 602, 603 (Minn. 1927)).  While Kentucky courts have referred to this portion of *Bryant* on limited occasions, *see, e.g.*, *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 856 (Ky. 2004) (summarizing part of *Bryant* and distinguishing it from the case before that court), the Court has failed to find Kentucky jurisprudence which seems to *clearly* state that such a provision violates Kentucky public policy that is "clearly expressed in the applicable law," *see Hodgkiss-Warrick*, 413 S.W.3d at 880–81 (citing *Ky. Farm Bureau Mut. Ins. Co.*, 1 S.W.3d at 476–77).  Additionally, Plaintiffs have failed to point to jurisprudence that meets this high standard.

from liability for representations or omissions made about the Material Customer prior to the closing of the Transaction under the Agreement.  Thus, the Motion to Dismiss as to the pre-closing misrepresentation and interference-with-a-contract claims must be **granted** and these claims must be **dismissed**.

> ### E.   Conversion

Wurzburger also asks the Court to dismiss a number of the claims based on his alleged actions post-closing.  The first post-closing claim he addresses is the claim for common-law conversion.  The claim is based on Plaintiffs' allegations that Wurzburger took confidential information with him after he was terminated, shared the information with his attorneys, and refused to return the information when asked.  (Doc. # 1 at ¶¶ 46–48).  Wurzburger argues that the conversion claim should be dismissed because it is barred by equitable estoppel and the economic-loss rule.  (Doc. # 12 at 12–13).  He also argues that the Plaintiffs have not pled sufficient factual allegations to state a claim for relief.  *Id.* at 13.  Wurzburger's argument, however, is based on North Carolina law.  *Id.* at 12–13.  Plaintiffs argue, alternatively, that the claim should stand under Kentucky law.  (Doc. # 17 at 15–18).

Seven elements must be proven to make out a claim for conversion in Kentucky:

(1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's right to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the

---

Moreover, *Bryant* is distinguishable from the case at bar.  *Bryant* seems to suggest that a it is against public policy for an individual who is party to a contract to write a contract that protect the individual from liability based on fraud.  *Bryant*, 287 S.W.2d at 921 ("The law should not, and does not, permit a covenant of immunity to be drawn that will *protect a person against his own fraud*." (emphasis added) (quoting *Ganley Bros.*, 212 N.W. at 603)).  Here, however, the individual being shielded from liability (Wurzburger) is *not* a party to the contract protecting him; he did not "contract against his [own] fraud."  *Id.*  Accordingly, Plaintiffs' public policy argument fails.

> defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.[10]

*Outfront Media, LLC v. LeMaster*, 399 F. Supp. 3d 671, 681 (E.D. Ky. 2019).  Essentially, "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."  *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853 (Ky. Ct. App. 2014) (quoting *Oliver v. J.J.B. Hilliard*, Nos. 2010-CA-001138-MR, 2010-CA-001236-MR, 2010-CA-001428-MR, 2010-CR-001479-MR, 2013 WL 762593, at *7 (Ky. Ct. App. Mar. 1, 2013)).

A review of Plaintiffs' Complaint in the light most favorable to the Plaintiffs, however, shows that they have not adequately pled a claim for conversion under Kentucky law as they have failed to allege facts supporting each element of the claim. Most notably, at no point do the Plaintiffs allege that Wurzburger's alleged taking and keeping of the confidential information "denied the plaintiffs right to use and enjoy the property" or that "the defendant intended to interfere with the plaintiff's possession."  *Id.*; *see also* (Doc. # 1).  In fact, nothing in the Complaint suggests that Wurzburger's alleged taking and failure to return the confidential information precluded Novolex from having access to that same information—a key element of a conversion claim.  *See Savidge*,

---

[10]     There is some discussion around the fact that Kentucky courts have used different elements for a conversion claim.  Other courts have used a three-part test which requires "(1) ownership rights in certain property, (2) the wrongful act of taking or disposing of property, and (3) causing damages."  *Savidge v. Pharm-Save, Inc.*, No. 3:17-cv-186-CHB, 2020 WL 265206, at *4 (W.D. Ky. Jan. 17, 2020) (quoting *Atmos Energy Corp v. Honeycutt*, Nos. 2011-CA-601-MR, 2011-CA-783-MR, 2013 WL 285397, at *11 (Ky. Ct. App. Jan 25, 2013)).  The use of this alternative set of elements does not change the analysis or the Court's ultimate conclusion.  *See id.* at *5 (indicating that under either test, allegations similar to the ones before this Court were insufficient to state a plausible claim for relief).

2020 WL 265206, at *5 ("[T]he tort of conversion requires an unauthorized taking or dispossession *to the complete* exclusion of the rightful possessor, not a mere temporary interference with property rights." (quoting in parenthetical *Cmty. Ties of Am., Inc. v. NDT Care Servs., LLC*, No. 3:12-cv-00429-CRS, 2015 WL 520960, at *19 (W.D. Ky. Feb. 9, 2015)) (internal citations omitted)); *id.* at *4 (finding the third element not met because "Plaintiff's do not allege that Pharm-Save's use of their PII ever denied them the 'right[ ] to sue and enjoy [their PII].'" (alterations in original)); *Jasper v. Blair*, 492 S.W.3d 578, 582 (Ky. Ct. App. 2016) (third element met because the purchase, disassembly, and sale of gold from a ring clearly was an exercise of "dominion and control over the diamond right" and the control denied "the right to use and enjoy the ring"); *see also* (Doc. # 1). This pleading failure is fatal to the conversion claim.  *See Savidge*, at *5 (indicating that limited factual allegations similar to the case at bar "are insufficient to survive a motion to dismiss").  Because the facts alleged do not support all elements of a conversion claim, the claim must be **dismissed** as a matter of law and the Motion to Dismiss as to this claim **granted**.

### F.    Breach of Fiduciary Duty

Next Defendant moves for dismissal of the breach-of-fiduciary-duty claim.  (Doc. # 12 at 14).  He argues that Plaintiffs' allegations in support of this claim are conclusory and "amount to nothing more than a formulaic recitation of the elements of the cause of action" which is insufficient to survive a motion to dismiss.  *Id.*  Plaintiffs disagree and point to facts which, they argue, support a plausible claim for breach of Wurzburger's fiduciary duties of care and loyalty after TWG was purchased by Novolex.  (Doc. # 17 at 18–19).

19

To make out a claim for breach of fiduciary duty in Kentucky, a plaintiff must show "(1) the existence of a fiduciary duty; (2) the breach of that duty; (3) and that the breach caused injury to the party to whom the duty was owed." *Seeger Enterprises, Inc. v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017) (citing *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189 (Ky. 2013)). "The scope of the fiduciary duty has been variously defined as one requiring utter good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing." *Insight Ky. Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016).

The Court must first consider whether Plaintiffs have adequately pled that Wurzburger owed Novolex[11] any fiduciary duties after closing. "There is no lockstep recipe for ascertaining when a fiduciary relationship exists." *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 770 (6th Cir. 2009) (citing *Abney v. Amgen, Inc.*, 443 F.3d 540, 550 (6th Cir. 2006)). Generally, however, "[u]nder Kentucky law, a fiduciary relationship exists where a relationship is 'founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking.'" *Serv. Drywall Co., Inv. v. Commonwealth Walls, Inc.*, No. 3:06-cv-372-2, 2008 WL 1897728, at *2 (W.D. Ky. Apr. 28, 2008) (quoting *ATC Distrib. Group, Inc. v. Whatever it Takes Transmission & Parts, Inc.*, 402 F.3d 700, 715 (6th Cir. 2005)). "While '[f]iduciary relationships can be informal, [ ] they must evidence circumstances showing both parties agreed that one party would be acting in

---

[11]    As the other two Plaintiffs have been dismissed, the Court will only consider whether Wurzburger owed Novolex, the remaining Plaintiff, any fiduciary duties.

the interest of the other." *Abney*, 443 F.3d at 550 (quoting *In re Sallee*, 286 F.3d 271, 281 (6th Cir. 2005)).

It is well-settled that "[o]fficers and directors owe fiduciary duties to the corporation." *Gross v. Adcomm, Inc.*, 478 S.W.3d 396, 400 (Ky. Ct. App. 2015); *see also FBK Partners, Inc. v. Thomas*, No. 6:09-cv-292-GFVT, 2010 WL 4940056, at *4 (E.D. Ky. Nov. 30, 2010) (citing *Steelvest v. Scansteel*, 807 S.W.2d 476, 485 (Ky. 1991)).  Where a duty is not automatically recognized, however, courts will consider the facts of a situation to determine if a fiduciary duty is owed.  *See Serv. Drywall Co.*, 2008 WL 1897728, at *2; *FBK Partners, Inc.*, 2010 WL 4940056, at *5.  For example, Courts have found a non-officer plaintiff to have fiduciary duties in a situation where the plaintiff was, among other things, "given oversight and control over the operations of [the company's] Louisville office as well as access to [the company's] confidential information."  *Serv. Drywall Co.*, 2008 WL 1897728, at *2; *see also FBK Partners, Inc.*, 2010 WL 4940056, at *5 (denying summary judgment on the breach-of-fiduciary-duty claim because the title of "assistant plant manager and lead extrusion machine operator" on its own "supports an argument that he owed FBK fiduciary duties, and because the movants did not address these 'employment relationship' factors or argue that [his] relationship with FBP was not one 'founded on trust or confidence'").

Prior to the closing of the Transaction, the Complaint makes clear that Wurzburger was the President and CEO of TWG.  (Doc. # 1 at 1).  Following the closing of the Transaction, however, the Complaint merely alleges that "Wurzburger continued to oversee TWG's operation under Novolex's ownership" in some type of management role. *Id.*; *id.* at ¶ 100 (discussing Wurzburger's "failures as a manger").  While the relationship

between Wurzburger and Novolex post-closing is not completely clear, it appears, reading the Complaint in the light most favorable to the Plaintiffs, that Wurzburger is a senior executive at Novolex. *Id.* at ¶ 37 (suggesting that Wurzburger was a senior executive by alleging information about "Wurzburger and another senior Novolex executive"). Additionally, it is alleged that Wurzburger was required to "use his best efforts[,] skills and abilities to promote the interests of the Company as necessary to diligently and competently perform the duties of his position," avoid activities that created a conflict of interest with the goals of Novolex, and not disclose proprietary or confidential information. *Id.* at ¶¶ 71, 74, 77; *see also id.* at ¶¶ 98–99. While it is not clear whether Wurzburger functioned as an officer of Novolex who would automatically owe the company fiduciary duties, reading the Complaint in the light most favorable to the Plaintiffs, it does appear from the allegations in the Complaint about Wurzburger's role at Novolex after closing that he had a relationship with Novolex "founded on trust or confidence . . . which also necessarily involve[d] an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Serv. Drywall Co., Inv.*, 2008 WL 1897728, at *2. (quoting *ATC Distrib. Group, Inc.*, 402 F.3d at 715). Accordingly, the Complaint has plausibly pled that Wurzburger owed Novolex a fiduciary duty.

As to the other elements, the Court finds these to be plausibly pled as well. The allegations of Wurzburger's misconduct in withholding information from Novolex in an attempt to maintain his job and earn the SIP bonus, plausibly show a breach of the fiduciary duties Wurzburger owed to Novolex during his post-closing employment. *Id.* at 2–3, ¶¶ 35–38, 40, 100–101. Moreover, Novolex has alleged that, as a result of these

breaches of his fiduciary duties, Novolex was harmed.  *Id.* at ¶ 38 (indicating that Wurzburger's actions "undermined Novolex's efforts to address TWG's numerous negative business issues and put Novolex at risk of having a culture in which withholding information, or providing false information, was actively encouraged."); *see also id.* at ¶ 102.  Accordingly, viewing the Complaint in the light most favorable to the Plaintiffs and accepting all allegations as true, the Court finds that a plausible claim for breach of fiduciary duty exists and the Motion to Dismiss on this ground must be **denied**.

### G.    Post-Closing Negligent and Fraudulent Misrepresentation

Finally, Wurzburger moves for the post-closing claims of negligent misrepresentation and fraudulent misrepresentation to be dismissed because the claims were not particularly pled as required by Federal Rule of Civil Procedure 9(b).  (Doc. # 12 at 14–16).  The Plaintiffs argue in opposition that the heightened pleading standard should be applied more leniently because "there has been no discovery in this action, and the alleged fraud occurred over an extended period of time, consisted of numerous acts, or is within the knowledge and control of Defendant."  (Doc. # 17 at 21–23).

Under Kentucky law, claims of negligent and fraudulent misrepresentation must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 562 (6th Cir. 2013) (citing *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247–48 (6th Cir. 2012)).  This pleading standard requires a plaintiff to "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent."  *Republic Bank & Trust, Co.*, 683 F.3d 239, 247 (citing *Ind. State Dist. Council of Laborers*

& *Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942–43 (6th Cir. 2009)).  In other words, the Complaint "must, at a minimum, 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."[12] *Bell v. Kokosing Indus., Inc.*, 2:19-cv-53-DLB-CJS, 2020 WL 4210701, at *16 (quoting *Coffey v. Foamex L.P.*, 2 F. 3d 157, 161–62 (6th Cir. 1993)); *see also Morris Aviation*, 730 F. Supp. 2d at 697 (the heightened pleading standard as applied to a negligent-misrepresentation claim required that "the complaint specify the statements in question, identify the speaker, and state where and when the statements were made.").  When evaluating allegations that must meet the heightened pleading standard, "a court must factor in the policy of simplicity in pleading [under Federal Rule of Civil Procedure 8, which] requires a 'short and plain statement of the claim,' and calls for 'simple, concise,

---

[12]    Plaintiffs are correct that courts in this district, including this Court, have applied this particularity requirement more leniently, albeit in very limited situations. *Compare*, *e.g.*, *Childress v. Bank of Am., N.A.*, 2:18-cv-154-DLB-CJS, 2019 WL 3767464, at *11 (E.D. Ky. Aug. 9, 2019) (citing *Whalen v. Stryker Corp.*, 783 F. Supp. 2d 977, 982 (E.D. Ky. 2011)) (applying the more lenient approach); *Whalen*, 783 F. Supp. 2d at 982 (citing *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509–10 (6th Cir. 2007)) (same), *with Loxodonta Aviation, LLC v. Delta Private Jets, LLC*, No. 2:19-cv-109-DLB-CJS, 2020 WL 4516829, at *7–8 (E. D. Ky. Aug. 5, 2020) (applying the 9(b) heightened pleading standard); *Bell v. Kokosing Indus., Inc.*, 2:19-cv-53-DLB-CJS, 2020 WL 4210701, at *16–17 (E.D. Ky. July 22, 2020) (same).

In some recent cases, this more lenient reading of 9(b) has been applied to situations where an unsophisticated plaintiff alleges multiple instances of fraud, sometimes as part of a complicated fraudulent scheme, by a company over a long period of time.  *See Childress*, 2019 WL 3767464, at *11 (plaintiff alleging multiple instances of fraudulent statements by Bank of America representatives over a number of months and claiming that the bank "had knowledge of these fraudulent statements and continued to give her misinformation so that her account would continue to incur additional fees and costs and Defendant would make additional money off Plaintiff"); *Whalen*, 783 F. Supp. 2d at 982 (plaintiff alleging that a medical device company "made false and fraudulent statements to her, her doctors, the public, and the FDA including statements that the pain pumps were safe for their intended use in the shoulder joints, despite studies and tests to the contrary").  In fact, it appears that such a situation is the only instance in which the undersigned has applied the more lenient approach.  This is not the situation, however, that is currently before the Court.

and direct' allegations." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988) (quoting Fed. R. Civ. P. 8).

In order to satisfy the "where" requirement of 9(b) a plaintiff need not specify the "the exact name or address of the location where the misrepresentation occurred," but must provide some indication of the location of the misrepresentation. *Loxodonta*, 2020 WL 4516829, at *7 (citing *Express Energy Servs. Operating, L.P. v. Hall Drilling, LLC*, No. 2:14-cv-204, 2014 WL 3456923, at *7 (S.D. Ohio July 11, 2014); *Sadler v. Gen. Elec. Co.*, No. 3:17-cv-328, 2017 WL 4158644 (W.D. Ky. Sept. 19, 2017)).   For example, courts have found the "where" requirement sufficiently met "where the complaint stated the fraud occurred at 'the location of the sales presentation,'" *id.* (quoting *Express Energy*, 2014 WL 3456923), or identified the medium through which the statement was made (i.e. email, phone), *id.* (citing *Sadler*, 2017 WL 4158644).   Additionally, the "when" requirement must "sufficiently narrow down when [the defendant] made the misrepresentations . . . to allow [the defendant] to respond to the allegations of fraud in a meaningful way."   *Id.* (collecting cases which found the "when" requirement insufficiently pled when the alleged actions occurred "up to and through closing," "at or prior to the time of contracting," or over a period of 10 months).

When dealing with a claim of misrepresentations by omission, the heightened pleading standards are slightly relaxed because "a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim."   *B.L. v. Schuhmann*, 380 F. Supp. 3d. 614, 651 (W.D. Ky. 2019) (quoting *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098–99 (N.D. Cal. 2007)).   The complaint should still, however, "detail[] the allegedly

fraudulent omission, note[] the specific Defendants involved in the alleged scheme, explain[] why the omissions were fraudulent, and identif[y] the injury caused by those omissions." *Id.* In other words, it appears that the plaintiffs must still attempt to provide information on the where and when of the alleged omission. *See Gaunce v. CL Medical, Inc.*, No. 5:14-cv-346-DCR, 2015 WL 893569, at *2 (E.D. Ky. Mar. 2, 2015).

Additionally, these 9(b) particularity principles must be considered in harmony with "the purpose undergirding the particularity requirement of Rule 9(b) [which is] to provide a defendant fair notice of the substance of plaintiff's claim in order that the defendant may prepare a responsive pleading." *Id.* (citations omitted). "Rule 9(b) discourages 'fishing expeditions and strike suits' which appear more likely to consume a defendant's resources than to reveal evidences of wrongdoing." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citing *U.S. ex rel. Bledsoe*, 501 F.3d at 510).

In the Complaint, Plaintiffs make the following allegations about Wurzburger's alleged negligent and fraudulent misrepresentations post-closing: (1) "Wurzburger continued his pattern of deception following the Closing of the Transaction, in an attempt to stay employed until December 31, 2018, so that he would be eligible to be paid under the SIP," (Doc. # 1 at ¶ 29); (2) "[a]fter the closing Wurzburger's deception continued . . . [t]his deception included, without limitation, issues regarding customer relations, operations and finances," *id.* at ¶¶ 33–34; (3) "Wurzburger consistently withheld information from Novolex regarding the status of the TWG Recovery Plan and the chances for its success and frequently responded to management with inconsistent or incorrect data," *id.* at ¶ 35; (4) "Wurzburger's deceptive behavior also included failing to

tell Novolex or misleading Novolex regarding the status of other customer relationships and terms, and with respect to various operational and financial issues," *id.* at ¶ 36; and (5) "Wurzburger engaged in a pattern of withholding information from, or providing false information to, the Novolex management team and encouraged his peers and subordinates to do the same,"[13] *id.* at ¶ 37.

These general allegations are insufficient to satisfy the particularity requirements and put the Defendant on notice of the substance of the fraudulent and negligent misrepresentation claims. *See Advanced Lifeline Servs., Inc. v. Central Hospital Servs., Inc.*, No. 3:18-cv-00032-RGJ, 2019 WL 575388, at *2 (W.D. Ky. Feb. 12, 2019) ("General allegations of fraud are insufficient." (citing *VanDenBroeck v. CommonPoint Mortgage Co*, 210 F.3d 696, 701 (6th Cir. 2000))). None of the allegations as to Wurzburger's post-closing conduct describe specific statements he made about customer relations, operations, and finance issues. *See* (Doc. # 1). In fact, the Complaint does not even suggest what specific issues existed after closing that were related to customer relations, operations, and finance. *See id.* Additionally, it does include allegations of information that Wurzburger knew and allegedly withheld, as has been required to adequately plead fraudulent omissions. *See id.*; *see also B.L.*, 380 F. Supp. 3d at 652 (identifying the allegations which support the fraudulent-omission claim). Plaintiffs have not pled even one specific instance of Defendant making one of the alleged misrepresentations. The lack of specific statements is particularly glaring in light of the fact that Plaintiffs have

---

[13]     The Complaint then alleges that Wurzburger "actively tried to get [a] senior executive to withhold information about the loss [of a customer] from Novolex's management team, even though if this information was known action could be taken to save the business or mitigate the loss." (Doc. # 1 at ¶ 37). This allegation deals with alleged actions beyond misrepresentations Wurzburger himself allegedly made to Novolex post-closing.

access to at least some of Wurzburger's emails.  *See* (Doc. # 1 at ¶ 31).

Moreover, Plaintiffs have made no attempt to identify when the alleged misrepresentations were made, beyond labeling them as "post-closing," nor are there any allegations of where the misrepresentations took place or what made them fraudulent.[14] *See* (Doc. # 1).  For example, even the most specifically pled misrepresentations and omissions regarding the TWG Recovery Plan, *id.* at ¶ 35 ("Wurzburger consistently withheld information from Novolex regarding the status of the TWG Recovery Plan and the chances for its success and frequently responded to management with inconsistent or incorrect data"), does not give any information about where or through what medium the misrepresentations were made and the Complaint simply suggests that the misrepresentations occurred "after the closing," *id.* at ¶ 33.  Thus, the "where" and "when" requirements have not been adequately pled.  *See Loxondonta*, 2020 WL 4516829, at *7.

Additionally, the Complaint fails to explain how the alleged withholding of information about the TWG Recovery Plan was fraudulent, which appears to be necessary to "provide a framework for relevant discovery and alert Defendant[] 'as to the particulars of [the] alleged misconduct' so that [he] may respond to the complaint."  *See B.L.*, 380 F. Supp. 3d. at 651 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011)) (finding fraudulent omission particularly pled when the complaint "detailed the allegedly fraudulent omission, noted the specific Defendants involved in the alleged scheme, explained why the omissions were fraudulent, and identified the injury caused

---

[14]    It is unclear which statements Plaintiffs rely on for the fraudulent-misrepresentation claims as opposed to the negligent-misrepresentation claims.  None of the claims meet the "where" or "when" requirements of the heightened pleading standard, however, which is fatal to allegations under either claim.

by those omissions.").  The pleading of the alleged TWG Recovery Plan omissions also does not suggest any information about "the time, nature, and place of the . . . omission" and instead . . . discusses . . . [the allegedly fraudulent] omissions only at a high level of generality."  *Gaunce*, 2015 WL 893569, at *2; *see also Sims v. Atrium Medical Corp.*, 349 F. Supp. 3d 628, 644 (W.D. Ky. 2018) (quoting *Gaunce*, 2015 WL 893569, at *2–3).

In sum, the Plaintiffs have failed to plead sufficient allegations to allow the Defendant to respond to the fraudulent and negligent-misrepresentation claims.  *See Loxodonta Aviation, LLC*, 2020 WL 4516829, at *7–8; *Bell*, 2020 WL 4210701, at *16–17. As this Court has previously done, it will **dismiss** these post-closing claims for failing to meet the particularity requirement of Rule 9(b).  Accordingly, the Motion to Dismiss these claims is **granted**.

## III.    CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** as follows:

(1)    Defendant's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**;

(a)    Defendant's Motion to Dismiss all claims by TWG and WNA as well as the pre-closing negligent-misrepresentation, fraudulent-misrepresentation, and interference-with-a-contract claims (Counts I, II, III), and the post-closing conversion, negligent-misrepresentation, and fraudulent-misrepresentation claims (Counts VI, VIII, IX) by Novolex is **GRANTED** and those claims are **DISMISSED**;

(b)    Defendant's Motion to Dismiss the breach-of-fiduciary-duty claim (Count VII) by Novolex is **DENIED** and the claim shall **proceed to discovery**; and

(2)      Defendant **shall file an Answer** to the remaining viable claims (Counts IV, V, and VII) in the Complaint (Doc. # 1) within **fourteen (14) days** of the date of entry of this Order.

This 17th day of August, 2020.

Signed By:

*David L. Bunning*   DB

United States District Judge

J:\DATA\ORDERS\Cov2019\19-145 MTD.docx